**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | | |
|---|---|---|
| **DAVID R. DAIGLE and MARY ANN DAIGLE** | * | |
| | * | **CIVIL ACTION NO. ___________** |
| **VERSUS** | * | |
| | * | |
| **CIMAREX ENERGY COMPANY and DRIVE ENERGY, INC.** | * | |
| | * | |
| | * | |
| | * | |

*** * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * ***

**ORIGINAL COMPLAINT**

NOW INTO COURT, through undersigned counsel, comes David R. Daigle and Mary Ann Daigle, plaintiffs herein, who hereby submit their Original Complaint as follows:

1.

For years, the Daigle family has worked hard to restore one of the region's rare long-leaf pine forests. The Louisiana Department of Wildlife and Fisheries ("DWF") considers this land a good example of a "critically imperiled plant community." DWF has recognized the family's effort by establishing the area as the "Bunchs Creek Natural Area," and awarding the Daigles a "certificate of appreciation" under the Louisiana *Natural Areas Registry Program*. The certificate of appreciation recognizes the Daigles for their "protection" of the site and "voluntary preservation of Louisiana's Natural Heritage." The site is also subject to a mineral lease and corresponding oilfield operations. The operators are responsible for an overturned oilfield services truck that leaked its contents into a now-dead wooded area. Also, the oilfield operators' careless work on the property has caused contamination and damage that has killed a large swath of the pine forest. The oilfield site was negligently constructed, and negligently operated in a

way that contaminated the property. This lawsuit seeks to restore the property, compensate the Daigles, and ensure careful oilfield operations going forward.

## PARTIES

2.

Plaintiff **David R. Daigle** is a person of full age of majority and is a citizen and resident of Ragley, Allen Parish, Louisiana, who jointly owns the property at issue in this litigation with Mary Ann Daigle.

3.

Plaintiff **Mary Ann Daigle** is a person of full age of majority and is a citizen and resident of Ragley, in Allen Parish, Louisiana, who jointly owns the property at issue in this litigation with David R. Daigle.

4.

Made defendants are the following parties:

a. **CIMAREX ENERGY COMPANY** is a foreign corporation having its principal place of business in Denver, Colorado. Cimarex Energy Company is also a corporate successor by merger of **Helmerich & Payne, Inc**. Cimarex Energy Company's registered agent in Louisiana is Corporation Service Company, 501 Louisiana Avenue, Baton Rouge, LA 70802.

b. **DRIVE ENERGY INC.** is a foreign corporation having its principal place of business in Nevada. Drive Energy, Inc.'s registered agent in Louisiana is Irving J. Prentice, 3337 North Hullen St., Metairie, LA 70002.

5.

The Plaintiffs appear in this matter as:

1. Third party beneficiaries to a certain oil, gas and mineral lease between Plaintiffs and Defendants (and Defendants' predecessors-in-interest);

2. Parties to a surface use agreement between Plaintiffs and Defendants (and Defendants' predecessors-in-interest);

3. Surface owners of real property contaminated and damaged by the oil and gas activities conducted or controlled by the Defendants (and Defendants' predecessors-in-interest) pursuant to mineral leases and amendments; and

4. The parties with the right of action and cause of action in this matter.

## VENUE AND JURISDICTION

6.

Jurisdiction is premised upon 28 U.S.C. § 1332 in that the plaintiff and the defendants are citizens of different states and the amount in controversy exceeds $75,000.00. No defendant is a citizen of Louisiana.

7.

Jurisdiction also rests in this Court pursuant to the Clean Water Act, 33 U.S.C. § 1365(a)(1), federal question jurisdiction, 42 U.S.C.§ 1331, the Declaratory Judgment Act, 28 U.S.C. § 2201, and this Court's supplemental jurisdiction over state law claims under 28 U.S.C. § 1367(a) because the federal and state claims are grounded in the same facts. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725 (1966) (state and federal claims arising from a "common nucleus of operative fact").

8.

Venue is proper in this Court because the property that is subject to this action is located in Allen Parish, Louisiana and within this District.

9.

Additionally, venue is proper in this Court under 33 U.S.C. § 1365(c)(1) because the source of the violations complained of is located within this District.

**NOTICE**

10.

On August 15, 2017, the Plaintiffs gave notice of their intent to file suit under the **Clean Water Act** to the Administrator of the Environmental Protection Agency ("EPA"), Louisiana Department of Environmental Quality ("DEQ"), and the Defendants, as required by Section 505(b)(1)(A) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A). A copy of this notice is attached to the complaint as Exhibit 1 (without attachments).

11.

On August 15, 2017 and August 17, 2016, the Plaintiffs gave notice of their intent to file suit under the **Louisiana Environmental Quality Act** ("LEQA") to the Secretary of the Louisiana Department of Environmental Quality ("DEQ"), and the Defendants, as required by La. R.S. § 30:2026(B). A copy of this notice is attached to the complaint as Exhibit 2 (without attachments).

12.

On August 15, 2017, the Daigles provided notice to the Defendants under the **Louisiana Tree Piracy** statute notice provision, La. R.S. § 3:4278.1(D). A copy of this notice is attached to the complaint as Exhibit 3 (without attachments).

13.

The Plaintiffs have not prosecuted the LEQA, Tree Piracy, and Clean Water Act claims until after the requisite delays of the notice period provided by law.

14.

Upon filing this Complaint, the Plaintiffs will provide notice under **Act 312 (La. R.S. § 30:29)** to the State of Louisiana Office of Conservation and Attorney General.

## FACTS

15.

The Plaintiffs (the "Daigles") own the approximately 115-acre surface of the following property in Allen Parish, Louisiana: The Southeast Quarter of the Southwest Quarter of Section Twenty-One (21), Township Six (6) South, Range Six (6) West, together with all improvements situated thereon, in the Bunchs Creek Oil and Gas Field of Allen Parish, Louisiana. This is hereinafter referenced as the "Daigles' Property."

16.

The Defendants have conducted, directed, and participated in oil and gas exploration and production activities as lessees, operators, and assignees in the Bunchs Creek Oil and Gas Field and on the Daigles' Property. The Defendants' activities include the construction and operation of oil and gas facilities, including, but not limited to, wells, pits, sumps, pipelines, flowlines, tank batteries, heater treaters, wellheads, and measuring facilities.

17.

Before October 5, 2000, Tyrrell L. Garth owned certain land prior including the 40-acre tract at issue in this lawsuit.

18.

On October 5, 2000, mineral lessor Tyrrell L. Garth entered into a 115-acre mineral lease ("**The 2000 Oil and Gas Lease**") with mineral lessee Kash Oil & Gas, Inc. ("**Kash**"). This lease included the 40-acre tract at issue in this lawsuit. *See* Exhibit 4, the "Garth Lease."

19.

Prior to Defendants' oilfield operations under the Garth Lease, no E&P, industrial or other commercial activities involving the use of chemicals or handling, storage, treatment or disposal of chemical wastes had been conducted on the 40-acre tract.

20.

On December 18, 2000, Tyrrell L. Garth sold by Cash Sale Deed the 40-acres at issue in this lawsuit to the Daigles ("**The 2000 Cash Sale Deed**"). Tyrrell L. Garth conveyed all rights except that the seller, Garth, "retains all of the mineral and royalty interests without the right to the use of the surface." The Plaintiffs, the Daigles, still own and use the 40-acre tract, plus an additional 90 acres, for longleaf pine savannah ecosystem restoration. *See* Exhibit 5, Cash Sale Deed.

21.

On December 22, 2000, Kash assigned 50% interest in the 2000 Oil and Gas Lease to Helmerich & Payne, Inc. ("**H&P**") a corporate predecessor by merger to Cimarex Energy Co. ("**Cimarex**"). *See* Exhibit 6, Assignment, Exhibit 4, the Garth Lease, and Exhibit 7 Affidavit of Rick White.

22.

On February 1, 2001, H&P entered into an operating agreement ("**The 2001 Operating Agreement**"). *See* Exhibit 8, Joint Operating Agreement.

23.

From February 10, 2001 till February 14, 2001, H&P built a road through the property that separated the East and West sides of the property. *See* Ex. 2 of Exhibit 7, Affidavit of Rick White.

24.

On February 15, 2001, an earthen reserve fluid pit was constructed. *See* Ex. 2 of Exhibit 7, Affidavit of Rick White.

25.

The Garth Well "reserve pit" that H&P used for its drilling and initial completion was not constructed with an impervious synthetic liner to prevent horizontal and vertical subsurface migration and seepage and to protect groundwater as required by Louisiana Department of Natural Resources regulations. *See* Exhibit 7, Affidavit of Rick White.

26.

The Garth Well reserve pit was not constructed with a recompacted clay liner tested to demonstrate 10-7 or greater hydraulic conductivity to prevent horizontal and vertical subsurface migration and seepage and to protect groundwater as required by Louisiana Department of Natural Resources regulations. *See* Exhibit 7, Affidavit of Rick White.

27.

The Garth Well reserve pit was used to treat and store liquid wastes associated with the drilling of the Garth Well (including water based mud, rainwater runoff at the location, wash out water, and salt water. Specific volumes of liquid chemical wastes were reported by H&P as removed from the Garth Well reserve pit by their contractor Scott Miller Oilfield Services of Lacassine in early May 2001 included 2410 bbls (132,550 gals) of "Water Base Mud" which would include chemical additives to the mud, 520 bbls (28,600 gals) of "saltwater", 334 bbls

(18,370 gals) of "wash water", 9530 bbls (524,150 gals) of "rain water" runoff from facility operations, and 260 bbls (14,300 gals) "fresh water." *See* Exhibit 7, Affidavit of Rick White.

28.

H&P knew at the time they drilled the Garth Well that the usable groundwater aquifer in the region was only 60' below the surface, and could be threatened by use of unlined reserve pits, any significant spill, and a failure to timely and completely restore and spill area. *See* Exhibit 9, Water Well Registrations.

29.

On February 23, 2001, H&P, as operator, obtained a permit to drill the T.L. Garth No.1, serial #225560 (Garth Well) on the Garth Lease. *See* Exhibit 10, Permit to Drill.

30.

On March 23, 2001, H&P drilled the T.L. Garth #1 well, serial number #225560 ("Garth #1 well") on the Daigle Property. The operator, H&P, contracted with Davies Construction "… to prepare the location and dig the earthen reserve pit at the Garth Well to be used in conjunction with its drilling operations." The pit was not lined or tested to demonstrate it had sufficient hydraulic conductivity to assure there would be no subsurface seepage as required by Louisiana Department of Natural Resources regulations, including Statewide Order 29B. *See* Exhibit 7, Affidavit of Rick White. H&P operated the well until H&P's merger with Cimarex.

31.

On March 28, 2001, H&P applied to the Louisiana Department of Natural Resources' Office of Conservation for a permit to dispose of the Garth Well drilling wastes into the annulus of the well. *See* Exhibit 11, Application for Disposal.

32.

On April 19, 2001, the Louisiana Department of Natural Resources denied the H&P request to dispose of the reserve pit wastes into the annulus of the Garth Well because the well had insufficient surface casing to isolate the underground source drinking water there. *See* Exhibit 12, DNR Denial of Application.

33.

On April 28, 2001, the Garth Well was completed as a gas well. *See* Exhibit 13, Well Information.

34.

H&P stored approximately 25,000 barrels of drilling mud and waste from the Garth Well in the unlined reserve pit. *See* Exhibit 11, Application.

35.

On May 10, 2001, following conclusion of the drilling of the Garth Well, H&P hired a contractor to "backfill the earthen reserve pit and clean up the Garth Well location." *See* Exhibit 7, Affidavit of Rick White. The Garth Well reserve pit was drilled without a closed mud system, and used a 75' x 75' x 6' deep unlined reserve pit to store significant volumes of saltwater, drilling fluid, and wash water. *See* Exhibit 14, Oilfield Waste Disposition.

36.

The "closure" of the Garth Well reserve pit included liquid removal and "backfilling" only. No excavations, no confirmatory soil or groundwater sampling beneath or adjacent to the pit during or after closure was performed to verify that seepage, or vertical or horizontal migration of pit fluids into soils and groundwater beneath and/or adjacent to the pit had not occurred, in violation of Louisiana Department of Natural Resources regulations. *See* Exhibit 7, Affidavit of Rick White.

37.

On December 4, 2001, H&P environmental consultant Tim Morton prepared a letter and report of his earlier survey findings regarding the Red Cockaded woodpecker, a listed endangered species, and the drill area as suitable habitat. *See* Exhibit 15, Correspondence.

38.

On January 7, 2002, U.S. Fish and Wildlife Service in letter to Tim Morton confirms that the Daigles' property and surrounding areas are suitable habitat for the endangered red cockaded woodpecker: "…the survey area contains suitable RCW nesting habitat and foraging habitat." Such habitat on private lands today is scarce. *See* Exhibit 16, U.S. Dept. of Interior Correspondence.

39.

On April 29, 2002, a complaint about leaking gas at the Daigle Property triggered an LDEQ inspection of the Garth Well, which found: "…visible hydrocarbons could be seen on the gravel. The stains were originating from the facility production unit…" *See* Exhibit 17, DEQ Incident Report.

40.

On June 6, 2002, effective May 21, 2002, Kash succeeded H&P as operator of the Garth Well. *See* Exhibit 18, Amended Permit. On August 13, 2002, effective June 17, 2002, H&P succeeded Kash as operator of the Garth Well. *See* Exhibit 19, Amended Permit.

41.

On July 12, 2002, H&P entered into a surface agreement and contract of release with the Daigles ("**The 2002 Surface Use Agreement**"). The 2002 Surface Use Agreement provides, in part, that "When the well is plugged and abandoned, lease road and gravel pad will be restored,

within 6 months, as near as possible to original condition. Upon Closure, soil parameters will meet L.D.N.R. 29-B criteria and/or criteria provided by governmental bodies having jurisdiction over the covered lands or operations." *See* Exhibit 20, Contract of Release.

42.

On November 13, 2002, effective October 21, 2002, Cimarex succeeded H&P as operator of the Garth Well. *See* Exhibit 21, Amended Permit.

43.

In September 2003, Cimarex had a Spill Prevention Control and Countermeasure Plan ("SPCC Plan") prepared for its Garth Well operations as required by U.S. EPA regulations 40 CFR, part 112. The Cimarex SPCC Plan required daily inspections of the Garth Well facilities and corresponding documentation of those inspections. Those inspections were not conducted on a daily basis as required by the Plan, and no documentation of any inspections was prepared as required by the Plan, all in violation of federal law. The purposes of the Plan, and the inspections required by it are to prevent releases to the environment, and to allow prompt cleanup of spilled wastes so that contamination as seen here at the Garth Well and on the Garth Lease premises does not occur, and if it does occur, that it does not spread and migrate into the groundwater as it has here. *See* Exhibit 22, SPCC Plan.

44.

On December 26, 2003, Cimarex reported closure of an unlined reserve pit at the Kingery Estates No. 1 well, which is north of and adjacent to the Daigles' Property. That closure report documents the burial of drilling waste in its closure. Post-closure test results show contaminants barium, arsenic, chromium, lead, and certain salt parameters present. These contaminants have

also been detected above action levels in groundwater beneath the Daigles' Property a few hundred feet away. *See* Exhibit 23, Lab Analysis.

45.

Unbeknownst to the Daigles, until sometime after January 1, 2006, the Garth #1 well was recompleted on or about July 29, 2004. On information and belief, on this day there was a spill from an oilfield work truck that caused a 1.8-acre dead tree area on the Daigles' Property (the "Dead Tree Area"). This was the truck of H&P's agent. 211 bbls of 9.6 ppg saltwater was "swabbed" during this recompletion, *i.e.* circulated out from the Garth Well. This volume of saltwater completion fluid, as well as any fluid remaining in the rig tanks, had to be hauled off location and is likely the source of the contamination found at the 1.8-acre dead tree spill area. *See* Exhibit 24, Activity Log. During the time of this recompletion work, Jessie Ardoin, an adjoining landowner, saw an overturned vacuum truck next to the road about 100 yards from the Garth #1 wellsite. *See* Exhibit 25, Deposition of Jesse Ardoin. Ruts on and adjacent to the road at the spill area indicate that a tank/vacuum truck overturned spilling its contents onto the Daigles' land.

46.

Groundwater testing at the Dead Tree Area establishes the presence of arsenic, lead, barium and chromium in excess of Louisiana RECAP risk based standards indicating that this site is a source of the groundwater contamination found on the Daigles' Property. Austin Arabie's revised expert report further disclosed that several discrete sources of contamination are collectively contributing to a common groundwater contamination problem in the Daigles' Property. *See* Exhibit 26, Arabie Report and Exhibit 27, Supplemental Report.

47.

Sometime after the July 2004 truck spill at the 1.8-acre Dead Tree Area, the product storage tank at the Garth Well overfilled on more than one occasion and spilled on the ground because the trucks did not pump the tank out in timely fashion. Confirmatory sampling after this spill and cleanup are not documented and therefore likely did not occur. *See* Exhibit 25, Deposition of Jesse Ardoin.

48.

Sometime after July 1, 2005, David Daigle noticed an area on the 40-acre tract west of the access road between the Garth Well and the 5830 RA SUA Kingrey Estate Well #1, serial #226841, also operated by H&P. Mr. Daigle had no idea what the cause of this vegetative impact was, or may be, and asked Austin Arabie, an environmental consultant, to investigate.

49.

On August 5, 2005, Arabie first inspected the property and collected soil samples for laboratory analysis. Follow-up sampling was performed on October 7, 2005. During this follow-up sampling event Mr. Ardoin first informed David Daigle that he saw an overturned vacuum truck at the 1.8 acre Dead Tree Area. *See* Exhibit 7D, Deposition of Jesse Ardoin. On November 11, 2005 and January 5, 2006, Arabie sent Daigle invoices totaling $3,359.90 for the environmental work done. *See* Exhibit 28, Arabie Invoice.

50.

A laboratory analysis of soil samples, taken less than a year before the Daigles filed a Louisiana state court suit in this matter, and taken where said spill occurred, revealed excessive levels of calcium-based completion fluids and other toxic and hazardous chemicals in excess of various regulatory standards. *See* Exhibit 29, Soil and Surface Water Sampling.

51.

On December 22, 2005 Arabie issued a report to Daigle: "Soil and Surface Water Sampling of Bunchy Creek Property Reeves, Louisiana." The report summarized: "Arabie Environmental conducted soil and surface water sampling of an approximate 1.8-acre portion of impacted property located near Reeves, Louisiana. The impacted property contains stressed vegetation consisting of various grasses and shrubs. Most longleaf pines in the impacted area are dead, and the remaining live ones appear severely stressed or dying. Based on field data and laboratory analyses obtained during the two sampling events conducted in August and October, it is evident that a spill of material containing calcium and chloride and possibly other contaminants has occurred on the property." *See* Exhibit 29, Soil and Surface Water Sampling.

52.

On April 19, 2006, David Daigle met Rick White of Cimarex and together they inspected the spill site area. Daigle showed White the hole on the west side of the road where the truck turned over, and tire ruts on the east side where a recovery truck would have made holes to pull the vacuum truck out. Daigle also informed Mr. White that he (Daigle) had an eyewitness to the overturned vacuum truck at the 1.8-acre Dead Tree Area.

53.

On May 5, 2006, Rick White, Cimarex Production Manager wrote to Daigle: "Cimarex will pay to remediate the damaged area, including timber damage, if such damage is reasonably determined to have been caused by our operations with respect to the wells or 'ponding' from our lease road." Cimarex proposed to conduct additional soil sampling at is expense. But Cimarex refused to admit knowledge of, or responsibility for, the completion fluid spill. *See* Exhibit 30, Correspondence.

54.

On May 8, 2006, Cimarex had Coastal Chemical analyze the produced water from the Garth Well and the nearby Kingery Estates well. Those analyses show the presence of barium, sodium, calcium, and chlorides, which have also been reported in the soil and groundwater samples taken at the Garth Well and other locations on the Daigles' Property. *See* Exhibit 31 and 32, Water Analysis Reports.

55.

On July 17, 2006, Cimarex expert CK Associates noted that "indicator parameters" of a "produced water release" include arsenic, chromium, lead, and oil and grease, Electrical conductivity (EC), and Sodium Absorption Ratio (SAR). These parameters were reported in various samples taken on the Daigles' Property at levels exceeding allowed regulatory limits. *See* Exhibit 33, Email of Rick White.

56.

On July 19, 2006 Cimarex Energy Services' environmental consultant CK Associates performed sampling at the Dead Tree Area identified by Arabie on the Daigle property. These CK sample results at certain locations confirmed levels of calcium, magnesium, and chlorides far in excess of background. Those results were provided to the Daigles' counsel on April 11, 2007. *See* Exhibit 34, Soil Assessment.

57.

In July and August, 2006, The Louisiana Department of Wildlife and Fisheries ("DWF") awarding the Daigles a "certificate of appreciation" under the Louisiana *Natural Areas Registry Program* that acknowledges the Daigles for their "protection" of the site and "voluntary preservation of Louisiana's Natural Heritage." DWF established the "Bunchs Creek Natural

Area," noting that it is part of a "critically imperiled plant community." *See* Exhibit 35, DWF Natural Areas Registry Program documents.

58.

On June 18, 2008, Dr. Charles Allen, Ph.D. visited the 1.8-acre dead tree site and issued a report "Botanical Evaluation of the Bunch's Creek Site, Allen Parish, Louisiana" which concludes that the site has been "disturbed", that one plant species found exclusively in the Dead Tree Area, *Bacopa monnieri*, "…is a plant of the coastal marsh in brackish to salty conditions…In inland Louisiana it is usually associated with the brackish conditions observed around oil wells. It has been observed in several inland parishes but almost always near oil wells or abandoned oil wells…the large clumps of this species indicate the presence of salt or other compounds that would create brackish conditions." *See* Exhibit 36, Botanical Evaluation.

59.

On September 25, 2008 Arabie Environmental Solutions issued a second report regarding environmental damage to the Daigles' Property caused by the Defendants' oil and gas activities. It evaluated all test results performed to date, including those produced by Defendants, and reported results of a recent April 9, 2008 sampling event by Arabie. The September 25, 2008 Arabie report Figure 3 identifies environmental damage to soil from LDNR Statewide Order 29-B SAR and EC parameter soil exceedances in the area of the former and now closed Garth Well reserve pit, which was located outside the gravel well pad. *See* Exhibit 26, Arabie Report and Exhibit 27, Supplemental Report.

60.

Inspections, testing, and analysis by the Daigles' expert in a September 25, 2008 report revealed widespread contamination across the surface of the property at the Garth No.1 well and

related facilities location where the Defendants operated. The report notes that, in addition to other contamination, the Sodium Adsorption Ration (SAR) and Electric Conductivity (EC) are more than double the allowable regulatory limit for these two salt parameters. *See* Exhibit 26, Arabie Report and Exhibit 27, Supplemental Report. The contamination and failure to cleanup establish unreasonable and unnecessary use of the Daigles' Property by the Defendants. The conditions also confirm that use and maintenance of the Daigles' Property by the Defendants was not performed in a manner consistent with prudent industry practices at all relevant times.

61.

The September 25, 2008 Arabie report identified environmental damage to groundwater at all three sample locations with LDEQ RECAP screening standard limit exceedances for barium, arsenic, chromium, and lead at the 1.8-acre dead tree spill site 100 yards north of the Garth Well and 100 yards south of the Garth Well. These levels are significant, order of magnitude level exceedances. In addition, the contaminant TPH-D exceeded LDEQ RECAP screening standards at a location 100 yards south of the Garth Well gravel well pad, and was detected in one groundwater sample at the 1.8-acre dead tree spill site. *See* Exhibit 26, Arabie Report and Exhibit 27, Supplemental Report.

62.

Environmental damage at the Garth Well area is the result of (1) the improper construction and closure of the reserve pit; (2) reported and not-reported known spills; (3) contamination events that may have occurred at any or all of the five recompletion workovers (*See* Exhibit 3, Affidavit of Rick White) and; (4) other oilfield activities of the Defendants unknown to the Daigles after diligent research and discovery performed to date. *See* Exhibit 7B,

Lab Analysis; Exhibit D, Soil and Surface Water Sampling; Exhibit 26, Arabie Report; and Exhibit 27, Supplemental Report.

63.

Groundwater testing 100 yards south of the Garth Well area establishes the presence of arsenic, lead, barium, chromium, and TPH-D in excess of Louisiana RECAP risk based standards indicating that this site is a likely source of the groundwater contamination found on the Defendants' Property. *See* Exhibit 26, Arabie Report and Exhibit 27, Supplemental Report.

64.

On February 1, 2009, production from the Garth Well ceased for approximately one year and eight months, and did not produce again until October 1, 2010. Accordingly, the Garth Lease by its own terms expired as production ceased for more than ninety days after the primary term. *See* Exhibit 7, Affidavit of Rick White. The nearby Kingrey Estate Well, at the end of the access road across the Plaintiff's Property, like the Garth Well, ceased producing on February 1, 2009, and production was not restored until October 1, 2010. On May 1, 2009, the 2000 Oil and Gas Lease and the 2002 Surface Use Agreement both expired.

65.

On May 11, 2010, effective May 1, 2010, Cimarex sold to Kash and Tennexco the following: the Garth Well and all related equipment, "…together with all rights and obligations incident thereto…." The deal also required Kash and Tennexco to: "assume and be responsible for and comply with all duties and obligations of Assignor, express or implied with respect to the interests conveyed herein, including without limitation, those arising under or by virtue of any lease, contract, agreement, document, permit, applicable statute or rule, regulation or order of any governmental authority (specifically including, without limitation, any governmental request

to plug, re-plug and/or abandon any well of whatsoever type, status or classification, or take any clean-up or other action with respect to the Property, including removal of any equipment associated in connection herewith), and (ii) defend and hold Assignor harmless from any and all claims in connection therewith, except any such claims against Assignor prior to the effective date hereof." *See* Exhibit 7, Affidavit of Rick White, and Exhibit 1, the Garth Lease.

66.

On information and belief, in the summer of 2010, a new operator, Double Eagle Resources, LLC, bought the Garth well bore from Kash.

67.

In May 2010, prior to restoring production for the Garth Well, Double Eagle Resources LLC secured a new road use agreement (Exhibit 37, the "**2010 Road Use Agreement**") and a new surface use agreement (Exhibit 38, the "**2010 Surface Use Agreement and Pipeline Right-of-Way**") with the Daigles in conjunction with its new Garth Well and Kingrey Estates Well operations. Accordingly, the Garth Lease, and the 2002 surface use agreement for the Garth Well and associated roads expired of their own terms and remain no longer in force or effect by their own terms by abandonment, and were superseded by/replaced with the new contracts with Midnight Drilling/Double Eagle Resources, LLC.

68.

On information and belief, on or about October 13, 2010, the mineral owner entered into a new oil and gas lease with Midnight Drilling, LLC ("**The 2010 Oil and Gas Lease**").

69.

On January 9, 2015, T.L. Garth assigned to the Daigles any environmental damage related litigation rights it may have not earlier conveyed: "To the extent not previously assigned

or conveyed in the December 18, 2000 Act of Sale to Daigle, Garth assigns all property damage rights and causes of action for and related to environmental damage to and pollution cleanup of the aforementioned 40 acres against Kash Oil &Gas, Inc., Helmerich & Payne, Inc., and Cimarex Energy, Inc. and their successors and assigns in whole or in part, occurring under or as a result of exploration and production related operations conducted pursuant to or in association with the October 5, 2000 oil and gas lease of the aforementioned 40 acres." *See* Exhibit 39, Assignment.

70.

Garth had no knowledge of the claims assigned to Daigle and/or asserted herein until sometime in January, 2015, immediately prior to his execution of the Assignment of said rights to the Daigles herein described.

71.

On May 1, 2015, Drive Energy, Inc. began to operate, and continues to operate, the Garth #1 well and related facilities. *See* Exhibit 13, DNR Well Information.

72.

H&P, Cimarex, and Drive Energy each at various times owned and operated the Garth Well, Garth Lease and related facilities located on the Daigles' Property.

73.

On April 26, 2017, June 15, 2017, July 5, 2017, and October 31, 2017, walk-throughs of the property by Mr. Daigle newly revealed past and present oilfield waste leaks from the Garth #1 well facilities. *See* Exhibit 40, Photos.

74.

Sampling was conducted at the site on October 31, 2017 at a spot directly adjacent to the Drive Energy tanks and beyond the safety berms. The sampling found oilfield waste

contamination in excess of Statewide Order 29-B Standards. *See* Exhibits 42 and 43, sampling report and map.

75.

The current operator, Drive Energy, is operating the oilfield site negligently, causing environmental damage to the property and constituting a hazard. Drive Energy is not properly maintaining its equipment, tanks, barrels, drums, and protective berms, which is causing oilfield waste leaks that are flowing beyond the facility's safety berms. Drive Energy has abandoned oilfield equipment on the site, such as drums and leaking, abandoned equipment. *See* Exhibit 40, Photos.

76.

Drive Energy's operations are causing irreparable injury, loss, and damage, and will continue to do so if allowed to continue in the same manner.

77.

The Defendants conducted their oil and gas operations on the Daigles' Property pursuant to the 2000 Oil and Gas Lease and the 2010 Oil and Gas Lease.

78.

The Daigles are successors-in-interest, assignees, or beneficiaries of the obligations owed by the Defendants under the 2000 Oil and Gas Lease, the 2002 Surface Use Agreement, the 2010 Oil and Gas Lease, and the 2010 Surface Use, Subsurface Agreement, and Pipeline Right-of-Way with respect to damage caused by the Defendants to the Daigles' Property in the course of Defendants' oil and gas operations.

79.

Defendants' wells were not operated in isolation. Rather, the Defendants' wells formed part of field-wide extraction and production operations that injected drilling fluids and collected minerals and waste and transported the minerals and waste from the wells through and to the other components of the extraction and production system. The extraction and production system encompasses the interconnected system of wells, pits, sumps, pipelines, flowlines, tank batteries, heater treaters, wellheads, and measuring facilities, throughout the Bunchs Creek Oil & Gas Field. The Defendants' extraction and production system extended throughout the Daigles' Property and across neighboring property ("Defendants' Oilfield Facilities").

80.

Defendants' oil and gas operations damaged the Daigles' Property by spilling and disposing of toxic and hazardous oilfield content and wastes on, in, and adjacent to the Daigles' Property. This spillage and disposal, which has not been removed, occurred without the Daigles' consent.

81.

Known events that resulted in the identified environmental damage are the construction, use, and deficient "backfill closure" of the Garth Well reserve pit; an April 29, 2002 leak from the Garth Well production facilities; the July 30, 2004 truck spill at the Dead Tree Area; the ongoing leaks visible from contemporary inspections.

82.

The environmental damage to Daigles' Property is the result of produced water, drilling fluid and completion fluid contamination. Their chemical constituents are conclusively proven to exist on the Daigles' Property at areas of the Defendants' oilfield activities in excess of regulatory levels as reported by both Plaintiff and Defendant test results. *See* Exhibit 23, Lab

Analysis; Exhibit 29, Soil and Surface Water Sampling; Exhibit 26, Arabie Report; and Exhibit 27, Supplemental Report.

83.

This environmental damage, identified to date by scientific testing and expert evaluation, is located around the Garth Well, the Dead Tree Area, and in subsurface migration pathways between and adjacent to those two sites. *See* Exhibit 23, Lab Analysis; Exhibit 29, Soil and Surface Water Sampling; Exhibit 26, Arabie Report; and Exhibit 27, Supplemental Report.

84.

Soil sampling and environmental damage indicate that the sources of property damage are (1) the truck spill area, (2) the earthen pit, and (3) leaks from the area well facilities, including in subsurface migration pathways. To the extent damages can be isolated, Defendant Drive Energy is not responsible for the damage caused by the truck spill and the earthen pit.

85.

The February 1, 2001 Baroid Drilling Fluid Program for the Garth Well recommended using drilling mud and additives containing many of these substances, including calcium, barium, hydrocarbons, sodium hydroxide (caustic soda), sodium acid, and graphitic coke. *See* Exhibit 41, Drilling Fluid Program.

86.

The chemical constituents in the groundwater sample analyses at the 1.8-acre dead tree spill area and 100 yards south of the Garth Well include barium, arsenic, lead, chromium, and TPH-D and accordingly bear the chemical “fingerprint” of oilfield waste contamination. *See* Exhibit 23, Lab Analysis; Exhibit 29, Soil and Surface Water Sampling; Exhibit 26, Arabie Report; and Exhibit 27, Supplemental Report.

87.

Inspections, testing, and analysis documented in the September 25, 2008 Arabie report prove contamination in soil and groundwater in excess of regulatory limits outside the Garth Well gravel well pad where Defendants operated and where the reserve pit was located. Said report notes that, in addition to other contamination, the Sodium Adsorption Ration (SAR) and Electric Conductivity (EC) are more than double the allowable regulatory limit for these two salt parameters. These two parameters are indicators of oilfield waste contamination, including but not limited to produced water, drilling fluid, and completion fluid. *See* Exhibit 26, Arabie Report.

88.

The contamination herein described and the failure to promptly or effectively clean it up not only constitutes excessive, unreasonable and unnecessary use of the Daigles' Property by the Defendants, it also confirms that use and maintenance of the Daigles' Property by the Defendants was not performed in a manner consistent with prudent industry practices at all relevant times.

89.

The Daigles did not have actual or constructive knowledge of the contamination described herein until less than a year prior to the filing of their prior state court action on June 1, 2006. The prior state court action was timely filed, and all claims relate back to the original filing. Involuntary dismissal of that suit interrupted prescription in the state court suit. Filing of this suit is within the prescriptive period.

90.

With respect to the Dead Tree Area, the Daigles first learned of the possibility of any claim for environmental damage at the Dead Tree Area sometime after July 1, 2005, when David Daigle first noticed stressed and dead trees in an area of their property down the road about 100 yards north of the Garth Well. Mr. Daigle decided to perform testing to determine what was the cause of the observed tree mortality. Sample results by the Dead Tree Area showing contamination were first provided to the Daigles in the December 22, 2005 Arabie Environmental Report. *See* Exhibit 26, Arabie Report.

91.

With Respect to the area by the Garth No. 1 Well, the Daigles had no knowledge of, and first learned of, the possibility of the Garth No. 1 area pollution and the related pollution claims until the September 25, 2008, when the Arabie Report for the first time revealed contamination by the well in excess of allowable regulatory closure limits, and in violation of specific contractual obligations and other Office of Conservation regulatory requirements.

92.

The calcium based completion fluids spilled on the Daigles' Property is a toxic and hazardous substance that will not break down readily in the environment and persists for generations unless properly remediated.

93.

Defendants knew or should have known that the aforementioned truck spill on the Daigles' property in the Bunchs Creek Oil Field resulted in the contamination of said lands, preventing full, free, unrestricted use, including but not limited to long leaf pine propagation. Rather than remove these toxins and the contaminated media, defendants chose to ignore said contamination, promoting and allowing the spreading and migration of this toxic pollution and

needlessly increasing the cost of remediation and causing the unnecessary death of the Daigles' trees.

94.

Despite possessing such knowledge, defendants at no time issued any warning or notice to the Daigles that a spill occurred, that the ground and groundwater were contaminated, or that there was hazard to property resulting therefrom.

95.

Defendants concealed from the Daigles the toxic and hazardous nature of these wastes and their chemical constituents and failed to warn or inform the Daigles of their toxic and hazardous properties.

96.

Defendants further concealed from the Daigles the fact that these spilled wastes would continuously migrate downward and outward spreading the toxic zone of contamination and creating new and greater property damage each day.

97.

The 2002 Surface Use Agreement with H&P, subpart 8, required H&P to notify the Daigles of any spillage on the property, yet the Daigles were not notified of the spill in accordance with the agreement. Further, the Daigles' property where the spill occurred has never been cleaned up or remediated, despite H&P's express obligation to the Daigles that "all spills will be cleaned up and remediated immediately...." Such conduct is not in conformance with industry practice and does not constitute prudent operations or conduct.

98.

The Defendants have failed to remediate and restore the Daigles' Property of the contamination caused by Defendants' operations. Despite lease and surface use agreement provisions intended to effect restoration of the property to safe regulatory levels this has not been done although the Daigles have made requests to certain defendants' representatives to do so.

99.

The Defendants operated in the oilfield by acts and omissions which caused and are causing damage that is not permitted by law or permit.

100.

The Defendants' acts and omissions include, but are not limited to:

1. Maintaining defective, improper, and inadequate storage, handling, and transport of oilfield production content and waste;
2. Conducting defective and improper disposal of oilfield waste at the site;
3. Causing and allowing leaks and discharges from the Defendants' oilfield facilities to contaminate the Daigles' Property.
4. Causing and allowing the Defendants' oilfield facilities to spill, leak, and discharge content and waste into the environment;
5. Causing and allowing a truck to spill its hazardous content onto the Daigles' Property, and failing to address the problem once caused;
6. Failure to handle, store, and dispose of oilfield production content and waste in a reasonable and prudent manner;
7. Failure to follow the standard of care under the regulatory structure;
8. Failure to follow express and implied obligations under applicable state permits and agreements;

9. Failure to use available and reasonably prudent operational techniques;
10. Failure to prevent unreasonable alterations to the surrounding land;
11. Failure to use reasonably prudent waste disposal techniques;
12. Failure to use reasonably feasible alternative methods;
13. Failure to use injection wells instead of pits, failure to design and operate pits so as to prevent discharges, and failure to design and operate flowlines so as to prevent discharges;
14. Failure to adequately monitor, measure, and test the Defendants' oilfield facilities to ensure facilities were operating properly; and
15. Other acts and omissions of negligence and gross negligence which may be discovered prior to trial in this matter.

101.

The Defendants' operations could have been conducted in a way that did not damage the Daigles' Property if Defendants' had used reasonably prudent alternatives.

102.

The Defendants operated oilfield pits on or near the Daigles' Property as part of their operations in this oil and gas field.

103.

The contamination of Daigles' Property has resulted in large part from the Defendants' use of several pits on or near the Daigles' Property that have not been closed in accordance with state regulations. Contamination emanating from unclosed pits is recognized as a continuing tort under Louisiana law.

104.

The Defendants with their specialized knowledge and training in oilfield waste storage and disposal and South Louisiana geology knew, or should have known, that the disposal of oilfield wastes in unlined earthen pits can result in seepage, which contaminates both surface and subsurface soils and groundwater. Despite this widespread industry knowledge they perpetuated the myth of "impermeable clay" as a barrier to contaminant migration that had no scientific basis and in fact was contrary to industry knowledge at that time. The Daigles have suffered damages resulting from the improper disposal of oilfield wastes in unlined earthen pits that were constructed by the Defendants on or near the Daigles' Property during the course of Defendants' oil and gas exploration and production activities. The oilfield wastes deposited in these pits include, but are not limited to, such substances as naturally occurring radioactive material ("NORM"), produced water, drilling fluids, chlorides, hydrocarbons, and heavy metals.

105.

NORM contains $Radium_{226}$ and $Radium_{228,}$ which are hazardous and toxic substances. NORM concentrates in oilfield equipment as a result of production activities and its presence on the surface can cause serious contamination and health-related problems. Under Louisiana Radiation Protection laws, property contaminated with NORM cannot be transferred for unrestricted use.

106.

Produced water typically contains: high levels of dissolved salts, with salinities ranging from 20 to 193 parts per thousand (ppt); elevated concentrations of trace metals; up to 25 parts per million (ppm) petroleum hydrocarbons; high concentrations of $Radium_{226}$; volatile hydrocarbon compounds, including benzene, toluene, xylene and ethyl benzene; Polynuclear Aromatic Hydrocarbons, including naphthalene, fluorene and phenanthrene; toxic heavy metals,

including chromium, lead, mercury, arsenic, barium and zinc; $Radium_{226}$ and $Radium_{228}$; and various hydrocarbon compounds; Some of these substances, such as benzene and $Radium_{226}$, have long been identified as human carcinogens. Most are listed hazardous substances under United States Environmental Protection Agency "Superfund" regulations, codified in 40 CFR Table 302.

107.

The Defendants used drilling fluid in the course of the Defendants' oilfield operations. Drilling fluids typically contain toxic and hazardous chemicals and fluids with metals such as chromium, barium, and arsenic, as well as other additives. Drilling fluid is harmful to the environment and human health when spilled into the environment. Drilling fluid's chemical constituents include metals such as chromium, barium, and arsenic, as well as oil and other hydrocarbon fractions. Drilling fluid also contains toxic additives such as bactericides, slimicides, and acids. Drilling fluid and its components have, like produced water, been demonstrated to be acutely toxic to aquatic organisms. Moreover, a 1982 American Petroleum Institute Study documented the uptake of toxic heavy metals by plants near drilling mud pits.

108.

The Defendants knew or should have known at the time they first commenced operations on the Daigles' property that these major wastes associated with oil and gas production — produced water, NORM and drilling mud — are highly toxic substances, and that the storage, handling and/or disposal in pits and other land applications could result in conditions which present an imminent and substantial endangerment to human health and the environment. The Defendants continued their dangerous land disposal and storage practices and otherwise failed to act responsibly or reasonably to said danger.

109.

The Defendants knew or should have known that their operations on the Daigles' property in the Bunchs Creek Oil Field resulted in the continuous and unabated discharge, storage, and/or disposal of these chemicals into and onto the ground and into surface waters and groundwater. Rather than remove these toxins and the contaminated media, the Defendants chose to cover up and/or ignore said contamination as a routine practice promoting and allowing the spreading and migration of this toxic pollution.

110.

The Daigles at all times trusted the Defendants to act as prudent operators with regard to oilfield waste handling practices. The Defendants' use of unlined pits for storage and disposal of wastes as described herein, failure to test soil and groundwater beneath the reserve pit in closure, and failure to comply with its own SPCC plan is imprudent operations and excessive and unreasonable use of Daigles' Property not contemplated or allowed by the mineral lease.

111.

Despite possessing such knowledge, the Defendants continued their practice of storing and disposing of and covering up oilfield wastes on or near the Daigles' property, and at no time issued any warning to the public, including the Daigles, that these storage/disposal/discharge sites were contaminated, or that they constituted a hazard to persons and property.

112.

The Defendants directed and/or participated in the use and abandonment of oil field waste storage pits, leaking flow lines, as well as the construction, operation, and removal of other exploration and production facilities and related equipment which have damaged the Daigles' Property with oilfield wastes.

113.

To the extent the Defendants performed any closure or cleanup of the Daigles' Property, it was done negligently, improperly, imprudently, and ineffectively.

114.

Defendants' failure to timely remove or remediate the contamination on the Daigles' Property has caused the contamination to migrate and spread, thereby causing increased and new damage, including but not limited to, contaminated soil and groundwater, and damage to vegetation. The continuous and ongoing migration of oilfield waste and the continuing presence of other wastes is causing new and ever-increasing damage to the Daigles' Property, and such damage will continue until such time as these wastes are removed and remediated.

115.

The areas of the Daigles' Property that are contaminated by the Defendants' oil and gas operations are outside of the facilities' safety berms, and these areas are not being used for any oil or gas purposes. It is reasonable to remediate and restore the land and currently unused oilfield areas now to their original condition. Remediation and restoration would not interfere with, or have any effect on, any ongoing mineral operations. The failure to remediate and restore these areas will lead to the increasing spread of contaminants and destruction of vegetation. As operator of these areas on the property, the Defendants are obligated to perform these remediation and restoration obligations, yet have failed to do so.

116.

The Daigles complain of problems caused by, (1) improper storage and disposal and related hidden subsurface migration of hazardous substances, including but not limited to naturally occurring radioactive material ("NORM"), chlorides, hydrocarbons, heavy metals and

other constituents of oil field waste, from defendants' abandoned oil field waste pits located on and/or adjacent to the Daigles' Property; and (2) surface and subsurface pollution on or adjacent to the Daigles' Property caused by leaks, spills, and other discharges of toxic and hazardous substances from the Defendants' pipelines, wells, tank batteries, gas plants, gas meters, and other equipment, facilities, and operations.

117.

The Defendants' operations have caused cumulative and collective impacts to the Daigles' Property. The Defendants' operations of the Defendants' oilfield facilities have together damaged the Daigles' Property in concert. Thus, there is a community of interest among the Defendants. The Defendants' damages to the Daigles' Property have commingled and are indistinguishable from one another. The combined effects of these operations have caused cumulative impacts to the Daigles' Property. The required remedies for the damages are the result of all of the Defendants' acts and omissions.

118.

Despite having knowledge of the toxic legacy of their spill, defendants did not attempt to go back and evaluate the continuous migration and related "fate and effects" of these abandoned and covered up toxic wastes.

119.

All of the Defendants' actions and inactions described herein constitute an unreasonable and unnecessary use of the Daigles' Property and are and were not consistent with prudent industry practice.

120.

Accordingly, as a direct and proximate result of the Defendants' actions in polluting the aforementioned land, the Daigles have suffered damage to their real property and interests therein.

121.

The Daigles' Property when in an uncontaminated state has unique environmental qualities. Retaining and restoring said value gives the Daigles a personal reason to use damages awarded for restoration to restore the property to its original pristine native condition. The Daigles will use any damage award for property restoration and cleanup for that purpose.

122.

The claims made and damages complained of herein were the result of sudden and accidental releases occurring within a discrete 72-hour period and which resulted solely from negligent acts and omissions of defendants.

## LEGAL CLAIMS

123.

The Daigles state causes of action in tort, the Civil Code, the Mineral Code, the Louisiana Environmental Quality Act, the Louisiana Tree Piracy statute, the Clean Water Act, and breach of contract under the applicable lease.

124.

The Daigles herein expressly do not pursue any defendants for claims that have been discharged in bankruptcy. If a party has filed or intends to file for bankruptcy concerning any of the claims alleged herein, it is the express intention of the Daigles not to pursue those claims or

party or parties in this action, even if such party has been inadvertently named as a defendant above.

125.

The Daigles claim damages for the evaluation, cleanup, and remediation of contamination that impacts or threatens to impact groundwater. The Daigles claim that they are entitled to restoration of any aquifers damaged by the pollution alleged herein.

126.

Because the obligations are coextensive, and the damages caused by the Defendants are indivisible, the Defendants are solidarily liable with one another for all restoration and remediation obligations. The Defendants are liable to the Daigles *in solido* for damages and economic losses. The Defendants are joint and solidary tortfeasors. The object of the performance owed by the Defendants is repair, remediation, and restoration of the Daigles' Property. As such the Defendants are solidarily liable for the repair, remediation, and restoration of Daigles' Property.

## COUNT 1: NEGLIGENCE AND RELATED STATUTES (LA. CIVIL CODE §§ 2315, 2316, 2317, 2317.1, 2320, 2322, AND 2688)

127.

The Defendants' acts and omissions included violations of their own company policies and industry practice and custom, and did not comply with the standards of care required of oilfield operators and by regulation. The Defendants concealed from state regulators that the Defendants had contaminated the Daigles' Property. The Defendants knew or should have known that their acts and omissions would contaminate the area thereby causing vegetation die-off and other property damage. The Defendants had a duty to protect the Daigles and the

Daigles' Property from these effects, but failed to take proper actions which would have prevented the damage. In addition, when the Defendants' learned their operations caused contamination of Daigles' Property, the Defendants had a duty to inform the Daigles and return to remediate the contamination. The Defendants' violation of these duties proximately caused the damages described herein: lost current and future economic value of activities that depend on such the land, stigma damages, and other damages to the Daigles' Property.

128.

Each of the Defendants' past and continuing acts and omissions as outlined above has caused, and will continue to cause, damage to the Daigles' Property, in violation of the standard of care as prescribed by the standards imposed by Louisiana laws and regulations, all governing the Defendants' respective activities at issue in this matter.

129.

Thus, in accordance with La. C.C. art. 2315 and other laws, each of the Defendants is bound to redress the damages to the Daigles' Property as caused by the Defendants' respective acts and omissions. The Daigles are also entitled to injunctive relief in the form of remediation and restoration, including undertaking all manner of remediation and restoration activities determined to be appropriate.

130.

The Defendants have had ownership, care, custody, and *garde* of the Defendants' oilfield facilities on the Daigles' Property. The Defendants had the right of supervision, direction, and control, as well as the right to benefit from control of the Defendants' oilfield facilities. The Defendants had, and have, a legal relationship to the property, comprising rights and duties.

131.

The Defendants' actions of storing and disposing of toxic or hazardous substances in pits when the Defendants knew theses pits would leak and seep without informing the Daigles that the pits would leak, seep, and allow hidden subsurface migration of those dangerous substances and use of flowlines and pipelines that they knew would corrode and leak constitute a negligent or intentional failure to warn plaintiffs of a dangerous condition and instrumentality under La. C.C. arts. 2315 and 2688.

132.

The Defendants' ownership of oilfield facilities constitutes ownership of a building under La. C.C. art. 2322. This building is in ruin that is caused by neglect to repair it, or is a vice of defect of the building, and that ruin has damaged the Daigles' Property. *See* La. C.C. art. 2317.1. Specifically, the poor condition of the oilfield facilities has caused the facilities to leak oilfield waste onto the Daigles' Property. Further, the Defendants knew, or in the exercise of reasonable care, should have known of the vice or defect which caused the damage. This damage could have been prevented by the exercise of reasonable care, and the Defendants failed to exercise such reasonable care. The presence of oilfield contamination on the Daigles' Property warrants court application of *res ipsa loquitur* that the Defendants are liable for contamination on the Daigles' Property.

133.

For every count, under La. C.C. art. 2320, the acts of employees of the Defendants bind the Defendant employers to liability because the acts and omissions might have been prevented but were not.

**COUNT 2: TRESPASS**

134.

The Defendants' unauthorized disposal and continuous long-term storage of toxic and hazardous substances on the Daigles' Property without the Daigles' consent constitutes a trespass.

135.

The continued migration of oilfield contamination is causing new and increasing damage to the Daigles' Property, and such damage will continue and increase until such time as the waste is removed.

**COUNTS 3: NUISANCE**

136.

The Defendants failed to use reasonably prudent operational techniques, failed to prevent unreasonable alterations to the surrounding land and groundwater, failed to use reasonably prudent waste disposal techniques, and failed to use reasonably feasible alternative methods to fulfill their purpose without damaging the Daigle's Property. The Defendants' acts and omissions created a hazardous condition affecting the Daigles. The Defendants could reasonably foresee that damage would ensue on the Daigles' Property as a result of their acts and omissions and their decisions not to mitigate the effects of their operations. The harm, inconvenience, and damage materially interfere with the Daigles' right to enjoy their property. The damage caused by the Defendants is an unreasonable intrusion into the Daigles' lives.

137.

The Defendants' unreasonable interference in the conduct of their oil and gas exploration and production activities and the associated discharge, disposal or storage of oilfield waste and other wastes on the Daigles' Property, has produced adverse effects and created a continuing, ongoing and damaging nuisance to the Daigles and the Daigles' Property.

138.

Thus, the Defendants are bound to abate the nuisance and redress the damages to the Daigles' Property. The Daigles are entitled to injunctive relief in the form of compensatory damages and remediation and restoration of the Daigles' Property.

139.

The Defendants' continuing acts and omissions have caused, and will continue to cause, contamination of the Daigles' Property, all in violation of the standard of care as prescribed in the regulatory framework and standards imposed by Louisiana laws and regulations, all governing the Defendants' activities at issue in this action.

140.

The Defendants' acts and omissions constitute a violation of the limitations on use of property outlined in Louisiana Civil Code article 667, *et seq*.

141.

The Defendants knew or, in the exercise of reasonable care, should have known that their acts and omissions would cause damage to the Daigles' Property and that the damage could have been prevented by the exercise of reasonable care, yet the Defendants have failed and continue to fail to exercise such reasonable care.

142.

Thus, the Defendants are bound to abate the nuisance and redress the damages to the Daigles' Property.

**COUNT 4: BREACH OF CONTRACT – THIRD PARTY BENEFICIARY – THE 2000 OIL AND GAS LEASE**

143.

Cimarex, and its predecessor H&P, are parties, lessees, assignees, or sublessees of the 2000 Oil and Gas Lease.

144.

Cimarex's acts and omissions, including the acts and omissions of Cimarex predecessor H&P, constitute a breach of their express and implied obligations under the 2000 Oil and Gas Lease.

145.

The Daigles are third-party beneficiaries of express and implied restorations provisions contained in the 2000 Oil and Gas Lease.

146.

Cimarex is liable to the Daigles for all obligations and liabilities of the lessee under the 2000 Oil and Gas Lease pursuant to Louisiana Revised Statute 31:128 ("To the extent of the interest acquired, an assignee or sublessee acquires the rights and powers of the lessee and becomes responsible directly to the original lessor for performance of the lessee's obligations") and 31:129 ("An assignor or sublessor is not relieved of his obligations or liabilities under a mineral lease unless the lessor has discharged him expressly and in writing.").

147.

Cimarex is liable for its failure to repair and restore the property, and is liable for damage caused by their conduct or the conduct of any of their agents, employees, guests, invitees, assignees, or other persons related in any way to Cimarex or its predecessor in interest, H&P.

148.

Cimarex and H&P's acts and omissions constitute a breach of the standards imposed by the Louisiana Civil Code and the Louisiana Mineral Code governing the conduct of prudent

operators, specifically the standards set forth in Civil Code articles 1994, 2683, 2686, 2687, 2688, and 2692 and Mineral Code article 134:

1. Louisiana Civil Code article 1994 provides that "An obligor is liable for the damages caused by his failure to perform a conventional obligation. A failure to perform results from nonperformance, defective performance, or delay in performance."

2. Louisiana Civil Code article 2683 requires the lessee ... "[t]o use the thing as a prudent administrator and in accordance with the purpose for which it was leased ...."

3. Louisiana Civil Code article 2686 provides "[i]f the lessee uses the thing for a purpose other than that for which it was leased or in a manner that may cause damage to the thing, the lessor may obtain injunctive relief, dissolution of the lease, and any damages he may have sustained."

4. Louisiana Civil Code article 2687 states that "[t]he lessee is liable for damage to the thing caused by his fault or that of a person who, with his consent, is on the premises or uses the thing."

5. Louisiana Civil Code article 2688 provides that "The lessee is bound to notify the lessor without delay when the thing has been damaged or requires repair, or when his possession has been disturbed by a third person. The lessor is entitled to damages sustained as a result of the lessee's failure to perform this obligation."

6. Louisiana Civil Code article 2692 provides "[t]he lessee is bound to repair damage to the thing caused by his fault ... and to repair any deterioration resulting from his ... use to the extent it exceeds the normal or agreed use of the thing."

7. Louisiana Mineral Code, La. R.S. § 31:134, provides that "[if] a mineral lease is violated, any aggrieved party is entitled to any appropriate relief provided by law."

149.

Cimarex and H&P's acts and omissions constitute a failure to act as prudent administrators of the property. Cimarex and H&P have failed to repair the damage to Daigles' Property caused by their fault. Cimarex and H&P's use of the Daigles' Property to store oilfield waste is a use of the property for a purpose other than that for which it was leased. Cimarex and H&P used the Daigles' Property in a manner that caused damage to the property. Through their acts and omissions, Cimarex and H&P have caused damage to the property in excess of the normal and agreed use of the property, and are therefore liable to the Daigles for the repair of the damage and deterioration of the property. Cimarex and H&P's acts and omissions damaged the property in violation of the express and implied lease obligations, subjecting Cimarex and H&P to appropriate relief provided by law. Cimarex and H&P failed to notify the Daigles that Cimarex and H&P damaged the Daigles' Property. The Daigles have not released Cimarex and H&P from either the express or implied obligations under the lease. Cimarex and H&P's violations of the implied and express obligations constitute an active and substantial breach of the leases, including a tortious breach of lease.

150.

Cimarex and H&P's acts and omissions constitute negligent and excessive use the Daigles' Property during extraction and production operations. The Louisiana Mineral Code, La. R.S. § 31:122, provides that a mineral lessee must act as a reasonably prudent operator. Cimarex and H&P's negligent and excessive use violates the implied obligations of lessees under the provisions of the Louisiana Mineral Code, including without limitation, La. R.S. § 31:122.

**COUNT 5: BREACH OF CONTRACT –**
**THE 2002 CONTRACT OF RELEASE/SURFACE USE AGREEMENT**

151.

The Daigles are a party to the 2002 Contract of Release / Surface Use Agreement.

152.

Cimarex and its predecessor, H&P, are parties to the 2002 Contract of Release / Surface Use Agreement.

153.

Cimarex and H&P's acts and omissions constitute a breach of the standards imposed by the Louisiana Civil Code governing the conduct of parties to a contract, including the standards set forth in Civil Code articles 1994, 2683, 2686, 2687, 2688, and 2692.

154.

Specifically, Cimarex and H&P have a duty arising from the express and implicit contractual obligations created by the 2002 Contract of Release / Surface Use Agreement to repair any damage caused by their conduct or the conduct of any of their agents, employees, guests, invitees, assignees, or other persons related in any way to Cimarex and H&P. Cimarex is liable for the failure to perform this obligation to repair and restore the Daigles' Property.

155.

Cimarex and H&P's acts and omissions constitute a failure to act as a prudent administrator. Cimarex and H&P's acts and omissions have caused damage to the Daigle's Property. Cimarex and H&P failed to notify the Daigles of the damage to the Daigles' Property. The damage and deterioration of the Daigles' Property is in excess of the normal and agreed use of the property, and Cimarex and H&P have failed to repair this damage and deterioration.

## COUNT 6: BREACH OF CONTRACT – THE 2010 SURFACE USE, SUBSURFACE AGREEMENT AND PIPELINE RIGHT-OF-WAY

156.

The Daigles are a party to the 2010 Surface Use, Subsurface Agreement, and Pipeline Right-of-Way.

157.

Drive Energy, Inc. is a party, lessee, assignee, or sublessee to the 2010 Surface Use, Subsurface Agreement, and Pipeline Right-of-Way.

158.

Driver Energy's acts and omissions constitute a breach of their express and implied obligations under the 2010 Surface Use, Subsurface Agreement, and Pipeline Right-of-Way.

159.

Drive Energy's acts and omissions constitute a breach of the standards imposed by the Louisiana Civil Code governing the conduct of parties to a contract, including the standards set forth in Civil Code articles 1994, 2683, 2686, 2687, 2688, and 2692.

160.

Specifically, Drive Energy has a duty arising from the express and implicit contractual obligations created by the 2010 Surface Use, Subsurface Agreement, and Pipeline Right-of-Way to repair any damage caused by their conduct or the conduct of any of their agents, employees, guests, invitees, assignees, or other persons related in any way to Drive Energy. Drive Energy is liable for its failure to perform this obligation to repair and restore the Daigles' Property.

161.

Drive Energy's acts and omissions constitute a failure to act as a prudent administrator. Drive Energy's acts and omissions have caused damage to the Daigle's Property. Drive Energy failed to notify the Daigles of the damage to the Daigles' Property. The damage and deterioration

of the Daigles' Property is in excess of the normal and agreed use of the property, and Drive Energy has failed to repair this damage and deterioration.

162.

In violation of the express terms of the 2010 Surface Use, Subsurface Agreement, and Pipeline Right-of-Way, Drive Energy has failed (1) to restore the surface of the land as near as reasonably practicable to its condition at the time of commencement of construction, and (2) to pay the Daigles for loss, damage, liability, cost or expense … on account of … damage to property of any kind … arising wholly or partially out of or in connection with or resulting from any operations under the agreement.

## COUNT 7: BREACH OF CONTRACT – THIRD PARTY BENEFICIARY – THE 2010 OIL AND GAS LEASE

163.

On information and belief, Drive Energy is a party, lessee, assignee, or sublessee of the 2010 Oil and Gas Lease.

164.

On information and belief, Drive Energy's acts and omissions constitute a breach of its express and/or implied obligations under the 2010 Oil and Gas Lease.

165.

On information and belief, the Daigles are third-party beneficiaries of express and/or implied restorations provisions contained in the 2010 Oil and Gas Lease.

166.

On information and belief, Drive Energy is liable to the Daigles for all obligations and liabilities of the lessee under the 2010 Oil and Gas Lease pursuant to Louisiana Revised Statute

31:128 ("To the extent of the interest acquired, an assignee or sublessee acquires the rights and powers of the lessee and becomes responsible directly to the original lessor for performance of the lessee's obligations") and 31:129 ("An assignor or sublessor is not relieved of his obligations or liabilities under a mineral lease unless the lessor has discharged him expressly and in writing.").

167.

Drive Energy is liable for its failure to repair and restore the property, and is liable for damage caused by their conduct or the conduct of any of their agents, employees, guests, invitees, assignees, or other persons related in any way to Drive Energy.

168.

Drive Energy's acts and omissions constitute a breach of the standards imposed by the Louisiana Civil Code and the Louisiana Mineral Code governing the conduct of prudent operators, specifically the standards set forth in Civil Code articles 1994, 2683, 2686, 2687, 2688, and 2692 and Mineral Code article 134.

169.

Drive Energy's acts and omissions constitute a failure to act as prudent administrators of the property. Drive Energy has failed to repair the damage to Daigles' Property caused by their fault. Drive Energy's use of the Daigles' Property to store oilfield waste is a use of the property for a purpose other than that for which it was leased. Drive Energy used the Daigles' Property in a manner that caused damage to the property. Through its acts and omissions, Drive Energy has caused damage to the property in excess of the normal and agreed use of the property, and is therefore liable to the Daigles for the repair of the damage and deterioration of the property. Drive Energy's acts and omissions damaged the property in violation of the express and implied

lease obligations, subjecting Drive Energy to appropriate relief provided by law. Drive Energy failed to notify the Daigles that Drive Energy damaged the Daigles' Property. The Daigles have not released Drive Energy from either the express or implied obligations under the lease. Drive Energy's violations of the implied and express obligations constitute an active and substantial breach of the leases, including a tortious breach of lease.

170.

Drive Energy's acts and omissions constitute negligent and excessive use the Daigles' Property during extraction and production operations. The Louisiana Mineral Code, La. R.S. § 31:122, provides that a mineral lessee must act as a reasonably prudent operator. Drive Energy's negligent and excessive use violates the implied obligations of lessees under the provisions of the Louisiana Mineral Code, including without limitation, La. R.S. § 31:122.

**COUNT 8: TREE PIRACY STATUTE**

171.

The environmental damage caused by Cimarex and its predecessor, H&P, includes destruction of trees in the Daigles' long-leaf pine forest. This destruction was done without the consent of the owner, the Daigles, and was not done in accord with any legal contract or agreement. Cimarex and H&P should have been aware that their actions were without the consent of the tree owners.

172.

The value of the trees destroyed by Cimarex and H&P is $225,000. *See* Exhibit 3.

173.

Cimarex is liable under Louisiana's Tree Piracy statute, La. R.S. § 3:4278.1 for treble damages of the fair market value of the trees, plus reasonable attorney fees and costs.

**COUNT 9: LOUISIANA ENVIRONMENTAL QUALITY ACT ("LEQA")**

174.

This lawsuit is brought, in part, under the Louisiana Environmental Quality Act ("LEQA"), La. R.S. § 30:2026.A(1).

175.

Under La. R.S. § 30:2075, "No person shall conduct any activity which results in the discharge of any substance into the waters of the state without the appropriate permit, variance, or license required under the regulations of the department adopted pursuant to this Chapter." *See also* La. Admin. Code 33:IX.301(B)(1).

176.

Under La. R.S. § 30:2076, "No person shall discharge or allow to be discharged into any waters of the state: (a) Any waste or any other substance of any kind that will tend to cause water pollution in violation of any rule, order, or regulation." *See also* La. Admin. Code 33:IX.301(B) (discharge of pollutants without a DEQ permit is forbidden); La. Admin. Code 33:IX.2311 (a permit is required for discharge of pollutants); La. Admin. Code 33:IX.2501 (a discharger must apply for a permit to discharge), and related statutes and regulations.

La. R.S. § 30:2076(F) prohibits the discharge of hazardous wastes into the underground waters of the state. Hazardous wastes are defined in La. R.S. § 30:2173(2) as "any waste, or combination of wastes, which because of its quantity, concentration, physical, or chemical characteristics may cause or significantly contribute to an increase in mortality or an increase in serious irreversible or incapacitating reversible illness, or pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, disposed of, or otherwise managed. Such definition shall be applied only to those wastes

identified and designated as such by the department, consistent with applicable federal laws and regulations."

Under La. R.S. § 30:2075, and related regulations, "No person shall conduct any activity which results in the discharge of any substance into the waters of the state without the appropriate permit, variance, or license required under the regulations of the department adopted pursuant to this Chapter."

177.

The Defendants' acts and omissions violate the Louisiana Environmental Quality Act provisions and other provisions because they result in discharges of substances into waters of the state (and underground waters) without an appropriate permit, and which causes water pollution. Specifically, the Defendants' discharges of oilfield pollutants from the earthen berm, from the overturned truck, and from leaks from the Garth #1 facilities are discharges into waters of the state. These discharges tend to cause water pollution in violation of state regulation. The Defendants do not have a permit for these discharges.

178.

Under La. Admin. Code 33:IX.1121, state waters must remain free from the effects of toxic substances.

179.

Under La. R.S. § 30:2073(6), "the introduction into waters of the state, by any means, ... of any substance in concentrations which tend to degrade the chemical, physical, biological, or radiological integrity of such waters…."

180.

In violation of Louisiana law, the Defendants' acts and omissions caused state waters to become damaged with toxic substances, namely the Defendants' oilfield wastes. Also in violation of Louisiana law, the Defendants' acts and omissions caused an introduction into waters of the state of a substance—oilfield wastes—which tend to degrade the chemical, physical, biological, and radiological integrity of such waters.

181.

Under La. R.S. 30:2076(A)(3), and related regulations, "No person shall violate any rule or regulation adopted under this Chapter or the terms of any permit or order issued under authority of this Subtitle." Under the Louisiana Administrative Code standards for Environmental Quality, "no solid waste shall be stored or allowed to be stored long enough to cause a nuisance, health hazard, or detriment to the environment as determined by the administrative authority." La. Admin Code tit. 33 pt. VII, § 503(A)(1). Under La. R.S. 30:2076(A)(4) and related regulations, an unauthorized discharge must be adequately cleaned up.

182.

The Defendants acts and omissions constitute violation of rules, including but not limited to, La. Admin Code tit. 33 pt. VII, § 503(A)(1) and La. R.S. § 30:2076(A)(4), because the Defendants disposal of oilfield waste into the ground and groundwater constitutes a nuisance, a health hazard, and a detriment to the environment, and this has not been adequately cleaned up.

183.

The Defendants ongoing acts and omissions are causing ongoing damages and ongoing violations of state law and regulations, particularly the ongoing operations at and by the Garth Well, which are causing leaks and discharges from the system into the environment.

**COUNT 10: CLEAN WATER ACT ("CWA")**

184.

This lawsuit is brought, in part, under the Clean Water Act, 33 U.S.C. § 1365(a)(1), for the unpermitted and untreated discharge of pollutants from the Defendants' oilfield operations at the Daigles' property.

185.

Section 505(a)(1)(B) of the Clean Water Act, 33 U.S.C. § 1365(a)(1)(B), permits any citizen to commence a civil action on his own behalf "against any person … who is alleged to be in violation of (A) an effluent standard or limitation under this chapter …." Section 505(f)(1) of the Clean Water Act, 33 U.S.C. § 1365(f)(1), defines "effluent standard or limitation under this chapter" as meaning, *inter alia*, an unlawful act under Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

186.

Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants from a point source into navigable waters of the United States, unless in compliance with various enumerated sections of the Clean Water Act. Section 301(a) prohibits, *inter alia*, such discharges not authorized by, or in violation of, the terms and conditions of an NPDES permit issued pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342.

187.

The discharge of pollutants, including oilfield contaminants, onto the Daigles' property from the earthen pit, from oilfield facilities and from an oilfield services truck, are discharges from a point source into navigable waters of the United States within the meaning of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

188.

The Defendants violated and continue to violate Sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1342, by discharging pollutants from the Garth #1 well facilities onto the Daigles' property without a permit issued pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342, authorizing such discharges.

**COUNT 11: UNJUST ENRICHMENT**

189.

The Defendants have been unjustly enriched by their unauthorized use of the Daigles' Property to store and dispose of toxic waste and contamination.

190.

For an undetermined length of time, the Defendants have stored toxic pollution and other wastes on or in the groundwater and soils underlying the Daigles' Property. The Defendants have derived substantial economic benefits from this storage in that their use of the subsurface of the Daigles' Property has allowed them to avoid the substantial costs and expenses associated with the proper disposal of this toxic pollution and other wastes. Thus, to the extent that the Daigles have no other adequate remedy at law to repair the damage caused by the Defendants, the Daigles are entitled to the civil fruits derived from the Defendants' trespass pursuant to Louisiana Civil Code article 486, which provides that a possessor in bad faith is liable for the "fruits he has gathered or their value subject to his claim for reimbursement of expenses." The Plaintiffs never agreed to allow their property to be used for the storage or disposal of the aforementioned wastes, and at all times trusted the Defendants to act as prudent operators with regard to oilfield chemical handling practices on the Plaintiffs' land.

**DAMAGES AND REMEDIES**

191.

**Restoration Damages**

Defendants have a legal duty in tort to restore the Daigles' Property to its condition prior to the harm caused by the Defendants at the earliest practicable time to prevent further migration and damage. The Defendants are also obliged under the surface use agreement with the Daigles to "immediately" clean up and remediate in the event of a spill.

192.

**Assessment and Response Costs**

The Defendants' pollution of the Daigles' property via a spill has caused the Daigles to incur certain response costs to identify and abate the damage and nuisance associated with the Defendants' conduct. The Daigles are entitled to recover said incurred response costs and additional money damages equal to the cost to conduct a comprehensive and expedited environmental assessment of all yet unidentified pollution on the Daigles' land due to the Defendants' misconduct.

193.

**Stigma and Diminution in Value Damages**

The Daigles seek recovery of stigma damages and the diminution in value of its polluted property which will continue even after complete restoration cleanup.

194.

**Loss of Use and Mental Distress for Damage to Real Property**

The Daigles are property owners whose full use and enjoyment of their property has been, and will continue to be, directly and adversely affected by the Defendants' discharge, spill and disposal of toxic chemical pollutants hereon or adjacent thereto. The Daigles have suffered loss of quiet use and enjoyment of their property, loss of enjoyment of unspoiled recreational

area, have incurred potential liability to third persons as a result of the Defendants' pollution, and other economic, personal, and aesthetic consequences.

195.

**Mandatory injunction**

The Daigles have suffered irreparable harm and damage as a result of the Defendants' unlawful and wrongful conduct, and seek a mandatory injunction requiring defendants to effect complete restoration of the Daigles' Property to its prior uncontaminated condition.

196.

**Prohibitory Injunction**

The Daigles have suffered irreparable harm and damage as a result of the Defendants' unlawful and wrongful conduct, and seek a prohibitory injunction to prevent the Defendants from further engaging in conduct which contributes to the migration of this toxic pollution.

197.

**Declaratory Judgment**

The Daigles seek declaratory judgement finding that defendants have violated and breached their contractual obligations to the Daigles by their unauthorized and improper spilling, discharge and/or disposal of oilfield wastes on the Daigles' property and failure to immediately remediate said contamination as they had agreed to do.

**LA. R.S. § 30:29**

198.

To the extent that the provisions of Louisiana Revised Statute 30:29 apply to this action, Plaintiffs assert the following:

1. Plaintiffs affirmatively allege that damages awarded by the court for remediation pursuant to Louisiana Revised Statute 30:29 will be used to clean up the above described contamination;
2. Plaintiffs are entitled to sufficient damages to restore Plaintiffs' Property as near as possible to its original condition;
3. Plaintiffs are entitled to a judgment ordering damages for, or implementation of, additional remediation in excess of the requirements of Louisiana Revised Statute 30:29 pursuant to express and implied provisions of contracts to which Plaintiffs are parties or third party beneficiaries;
4. Plaintiffs have personal reasons for wishing to commit the sums awarded for remediation to clean up the affected property;
5. Notice will be furnished to the Louisiana Attorney General and to the Louisiana Department of Natural Resources; and
6. Plaintiffs' assert that they have the right of action to seek cleanup of all the associated environmental damage, regardless if the source of the damage is located on the Plaintiffs' Property, and regardless if the Plaintiffs owned the property at the time of damage.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Defendants be cited to appear and answer this Petition for Damages and that after due proceedings, that judgment be entered herein as follows:

1. Awarding Plaintiffs compensatory damages in an amount to be proven at trial, including payment of the costs to remediate lands with identified and unidentified pollution to its original unpolluted state, unjust enrichment damages for the unauthorized disposal of

waste on Plaintiffs' Property without landowner's consent, civil fruits resulting from the illegal and bad faith trespass on Plaintiffs' Property, and other property damages;

2. Awarding Plaintiffs punitive or exemplary damages;
3. Awarding Plaintiffs the cost to restore the Plaintiffs' Property to its pre-polluted condition.
4. Awarding all other consequential damages, both foreseeable and unforeseeable, that relate to Defendants' breach of contract, including the costs and attorney's fees incurred in bringing this action;
5. Awarding Plaintiffs diminution in property value before and after, including stigma damages;
6. Ordering the Defendants to pay Plaintiffs sufficient funds so that Plaintiffs may conduct a comprehensive and expedited environmental assessment of Plaintiffs' Property to identify all hidden or not yet identified pollution on Plaintiffs' Property;
7. Awarding damages for annoyance, discomfort and inconvenience occasioned by nuisance created by Defendants, including loss of full use and enjoyment of Plaintiffs' Property and lost profits and income;
8. Ordering a mandatory and prohibitory injunction to restore Plaintiffs' Property to its pre-contaminated condition and to prevent the migration and spread of toxic and hazardous substances onto Plaintiffs' Property;
9. Ordering remediation and restoration of Plaintiffs' Property to its original condition;
10. Awarding damages from Defendants' failure to provide proper notification under the Louisiana Civil Code;

11. Awarding all costs, expenses, and reasonable attorneys' fees pursuant to any applicable provision of law, including but not limited to Section 505(d) of the Act, 33 U.S.C. § 1365(d);

12. Issue a declaratory judgment that the Defendants have violated and continue to violate Sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1342, by discharging pollutants onto the Plaintiffs' property without a permit issued pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342, authorizing such discharge.

13. To the extent that Louisiana Revised Statute 30:29 applies, approving a feasible remediation plan that complies with all applicable state regulations, without variances therefrom, including Statewide Order 29-B and state regulations requiring remediation of usable groundwater to drinking water standards;

14. To the extent that Louisiana Revised Statute 30:29 applies, approving a feasible remediation plan that protects the health, safety, and welfare of the people of Louisiana;

15. To the extent that Louisiana Revised Statute 30:29 applies, approving a feasible plan that protects and replenishes the natural resources of the state;

16. To the extent that Louisiana Revised Statute 30:29 applies, awarding all damages allowed under Subsection H and M of Louisiana Revised Statute 30:29;

17. Awarding Plaintiffs all costs of this suit and for legal interest therein for any amount awarded from the date of judicial demand until paid;

18. Awarding such other and further relief which the Court deems necessary and proper at law and in equity and that may be just and reasonable under the circumstances of this matter.

Respectfully Submitted,

/s/ Andrew Jacoby

Andrew K. Jacoby (#32512)
Scott, Vicknair, Hair, & Checki, LLC
909 Poydras Street, Suite 1100
New Orleans, Louisiana 70112
Phone: (504) 684-5200
Fax: (504) 613-6351
jacoby@svhclaw.com
*Counsel for Plaintiffs*

**PLEASE SERVE:**

*Cimarex Energy Company, through its registered agent:*

Corporation Service Company,
501 Louisiana Avenue
Baton Rouge, LA 70802

*Drive Energy, Inc., through its registered agent:*

Irving J. Prentice
3337 North Hullen St.
Metairie, LA 70002